T.C. Memo. 2017-16

UNITED STATES TAX COURT

STEPHEN P. HARDY AND ANGELA M. HARDY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22409-14.                    Filed January 17, 2017.

<u>Stephen L. Kadish</u>, <u>Matthew F. Kadish</u>, and <u>Dean M. Rooney</u>, for
petitioners.

<u>Anita A. Gill</u> and <u>Nancy P. Klingshirn</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Dr. Stephen P. Hardy is a plastic surgeon who performs

surgeries in various facilities, including Missoula Bone & Joint Surgery Center,

LLC (MBJ).  Dr. Hardy owns a minority interest in MBJ, but he has no day-to-day

management responsibilities.  Beginning with 2008 the Hardys reported the

[*2] income from MBJ as passive after having reported the income as nonpassive for previous years. The passive income allowed the Hardys to absorb unrelated passive activity losses. The Commissioner issued a notice of deficiency for 2008 through 2010 recharacterizing the income as nonpassive and determining deficiencies. The Commissioner also determined a section 6662(a) accuracy-related penalty for each year. The Commissioner argues that Dr. Hardy's activity as a plastic surgeon should be grouped with his activity at MBJ. After concessions by both parties, we must decide whether the Hardys may report Dr. Hardy's income from MBJ as passive. If so, we must also decide whether they may deduct a passive activity loss carryover from prior years. If the Hardys are liable for deficiencies, then we must decide whether they are liable for accuracy-related penalties. At trial the Hardys moved to amend the pleadings to conform to the evidence, arguing that they overpaid self-employment tax for 2008 and 2009. We will grant this motion.

The Hardys may treat Dr. Hardy's income from MBJ as passive for all three years. Because they did not previously group Dr. Hardy's medical practice with his ownership interest in MBJ, they are not regrouping his interest in MBJ. Moreover, the Commissioner may not regroup Dr. Hardy's activities into a single unit because there is more than one reasonable method for grouping his activities

**[*3]** and the Hardys' grouping does not have the principal purpose of circumventing the underlying policies of section 469.[1] However, the Hardys may not deduct a passive activity loss carryover for 2008 because they should have deducted the loss for the year in which the loss was incurred. Moreover, the Hardys are not liable for self-employment tax for 2008 or 2009 because Dr. Hardy received the distributions from MBJ as a limited partner acting in his capacity as an investor. Although the Commissioner did not meet his burden of production for section 6662(a) accuracy-related penalties for underpayments due to negligence, he may have met his burden of production for underpayments due to substantial understatements of income tax, depending on the Rule 155 computations. However, the Hardys established that they had reasonable cause and acted in good faith when they relied on the advice of a tax professional for claiming a passive activity loss carryover deduction from years that are not before us. They did not establish that they had reasonable cause and acted in good faith with respect to the portions of the underpayments due to the disallowed charitable contribution deductions, which were among the items they conceded.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*4]                          FINDINGS OF FACT

I.     The Hardys

The Hardys were married during 2008 through 2010, the years in issue.

Dr. Hardy is a plastic surgeon.  Since the early nineties he has practiced as a plastic surgeon specializing in pediatric reconstructive surgery.  Dr. Hardy conducts his medical practice through Northwest Plastic Surgery Associates, a single-member PLLC, which Mrs. Hardy runs as the chief operating officer.

Before joining a surgery center, Dr. Hardy operated on his patients at his office or at two local hospitals.  Dr. Hardy can operate at his office only if the procedure requires local anesthesia.  If a procedure requires general anesthesia, Dr. Hardy operates at a hospital.  And if a procedure requires an overnight stay, then the procedure must be performed at a hospital.  Dr. Hardy will explain to his patients the options for where a surgery can take place, and the practice manager will give them a cost estimate for different locations.  His patients determine where a surgery will be performed.  Because of the limited availability of operating rooms, however, Dr. Hardy struggles to obtain space at a hospital for the procedures.

Dr. Hardy is paid for the surgeries that he performs.  Surgical procedures generally have three fee components:  (1) a fee for surgical services provided by

[*5] the surgeon; (2) a fee for anesthesia services provided by the anesthesiologist; and (3) a fee for the use of a surgical facility and its accompanying services. Patients pay the facility fee separately from Dr. Hardy's fee as a surgeon. Facility fees typically include the use of medical equipment, supplies, and staff, who include the front office clerk and the nurses who provide pre- and post-operative care.

In 2001 the Hardys first considered opening their own surgery center. The Hardys believed that a surgery center would benefit patients because it would provide a cost-efficient alternative to having surgeries performed at a hospital, and it would provide Dr. Hardy with greater latitude in scheduling those surgeries.

The following year, the Hardys purchased land and drew up plans to build a surgery center. Before the Hardys began construction, representatives of MBJ and two other surgery centers approached Dr. Hardy about his becoming a member. The Hardys determined that it would be a wiser business decision to join an already operational surgery center because of the expenses of constructing, staffing, certifying, and operating the center.

II.    MBJ

MBJ was a limited liability company formed by a group of practicing physicians in 2004 for the purpose of operating a surgery center. It is treated as a

[*6] partnership for Federal income tax purposes. In 2005 MBJ began operating a surgery center.[2] MBJ provides patients with a cost-efficient alternative to having procedures performed at a hospital. MBJ is equipped for doctors to perform procedures that require local or general anesthesia; however, complex procedures and procedures that require an overnight stay must be performed at a hospital.

MBJ is professionally managed. MBJ hires its own employees and does not share any employees with Northwest Plastic Surgery. Like hospitals, MBJ directly bills patients for facility fees. MBJ then distributes to each of its members his or her share of the earnings based on the facility fees less expenses. MBJ uses a third-party accounting firm to prepare the Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., for the members. MBJ does not pay physicians for their procedures.

In 2006 Dr. Hardy purchased a 12.5% interest to join seven other practicing physicians in MBJ. He paid $163,974 for his interest. Dr. Hardy cannot sell his interest in MBJ to a third party. The following year, the Hardys built an office next to MBJ for Northwest Plastic Surgery.

---

[2]MBJ Orthopedic Center is a separate entity that was formed by some of the same doctors as MBJ. It is in the same building as MBJ. Dr. Hardy has no interest in the orthopedic center.

**[*7]**   Dr. Hardy has never managed MBJ, and he has no day-to-day responsibilities there.  Although he meets with the other members quarterly, he does not have any input into management decisions.  He generally is not involved in hiring or firing decisions.  His role and participation in MBJ have not changed since he became a member.

Dr. Hardy performs surgeries on patients at MBJ on Mondays.  Rarely, Dr. Hardy will operate at MBJ on other days of the week.  Dr. Hardy does not pay rent to perform surgeries at MBJ; the patients pay the facility fees directly.  In 2008 and 2009 Dr. Hardy performed 11% of the surgeries at MBJ.  In 2010 Dr. Hardy performed 9% of the surgeries at MBJ.  He also had designated alternating Tuesdays as his surgical days at two area hospitals.  On the other days of the week, Dr. Hardy continued to perform surgeries at his medical practice.  He performed approximately 50% of his surgeries at his office, 20% at MBJ, and the remainder at other facilities.

Dr. Hardy receives a distribution from MBJ regardless of whether he performs any surgeries at the surgery center, and his distribution is not dependent on how many surgeries he performs at MBJ.  MBJ does not have a minimum surgery requirement to receive a distribution.

**[*8]**    After 2010 Dr. Hardy hired another surgeon at Northwest Plastic Surgery. If that surgeon's patient chooses, the surgeon performs the surgery at MBJ. That surgeon does not hold an interest in MBJ.

III.    Reporting

Since 2004 the Hardys have been hiring Walter Kero, a partner and tax director at Junkermier, Clark, Campanella, Stevens, PC, to prepare and file their Forms 1040, U.S. Individual Income Tax Return. Mr. Kero is a certified public accountant with over 40 years of experience.

For 2006 and 2007 the Hardys reported their MBJ income as nonpassive. Using his training and experience, Mr. Kero tries to identify income as either payroll, passive, or portfolio. Mr. Kero determined that the income from MBJ was nonpassive by relying on the Schedule K-1. The Schedule K-1 stated that the income was from a trade or business and included self-employment tax. He did not group Dr. Hardy's ownership interest in MBJ with Dr. Hardy's medical practice activity, and he did not consider the grouping regulations.

The Hardys filed their 2006 return and attached a Schedule E, Supplemental Income and Loss, reporting $279,988 of nonpassive income from MBJ. They attached a Form 8582, Passive Activity Loss Limitations, reporting a total unallowed loss of $58,786. They did not attach any statement reporting that

**[\*9]** they had grouped Dr. Hardy's ownership interest in MBJ with his medical practice activity.

The Hardys filed their 2007 return and attached a Schedule E, reporting nonpassive income from MBJ of $199,121. They attached a Form 8582, reporting a total unallowed loss of $119,615, which included carryover losses from the previous year of $58,786. They did not attach any statement reporting that they had grouped Dr. Hardy's ownership interest in MBJ with his medical practice activity.

In 2008 Mr. Kero determined that the income from MBJ was passive, and he began reporting it as such. Mr. Kero learned that Dr. Hardy was not involved in the management of MBJ and was not liable for the debts of MBJ. In determining that the income was passive, he went through a checklist of passive activity criteria and obtained corroborating information from the Hardys. He determined that the relationship of Dr. Hardy to MBJ was passive.

Mr. Kero did not amend the Hardys' return for 2006 or 2007. Mr. Kero understood that the difference between passive and active characterization can have a profound effect on a taxpayer's income. However, because he did not believe the change would be material, he did not amend the Hardys' return for 2006 or 2007.

[*10] The Hardys filed their 2008 return and attached a Schedule E, reporting passive income from MBJ of $250,494. They attached a Form 8582, reporting a total passive activity loss of $256,411, which included carryover losses from previous years of $119,615. After netting their passive income against their passive losses, they also reported an allowable loss of $250,494, leaving $5,917 as a suspended loss. Additionally, the Hardys reported self-employment tax of $26,745 from the income Dr. Hardy received from Northwest Plastic Surgery and MBJ.

The Hardys filed their 2009 return and attached a Schedule E, reporting passive income from MBJ of $245,012. They attached a Form 8582, reporting an allowed passive activity loss of $104,224, which included a $5,917 carryover loss from the previous year. Additionally, the Hardys reported self-employment tax of $26,530 from the income Dr. Hardy received from Northwest Plastic Surgery and MBJ.

The Hardys filed their 2010 return and attached a Schedule E, reporting passive income from MBJ of $270,521. They attached a Form 8582, reporting an allowed passive activity loss of $157,187.

**[*11]** IV. <u>Notice of Deficiency</u>

The Commissioner issued a notice of deficiency for tax years 2008 through 2010 on June 24, 2014. For each year, the Commissioner disallowed the Hardys' passive activity loss deduction and itemized deduction for charitable contributions and determined a section 6662(a) accuracy-related penalty. While residing in Montana, the Hardys timely petitioned for redetermination of the deficiencies. They challenged the Commissioner's determination that they may not claim passive activity loss deductions against the income of MBJ. They also challenged the disallowance of the charitable contribution deductions and the imposition of accuracy-related penalties.

Trial was held in Cleveland, Ohio, on December 4, 2015. During trial the Hardys moved to conform the pleadings to the evidence, arguing that they overpaid self-employment tax for 2008 and 2009. After trial the parties submitted a stipulation of settled issues, resolving the remaining charitable contribution deduction dispute for 2008 and 2010. Subsequently, the Internal Revenue Service (IRS) released a technical advice memorandum which presented the same issues as this case.[3] We ordered supplemental briefs, which the parties filed.

---

[3]Tech. Adv. Mem. 201634022 (Aug. 19, 2016).

**[\*12]**                                    OPINION

We must decide whether the Hardys properly reported Dr. Hardy's income from MBJ as passive. If so, we must decide whether the Hardys may deduct a passive activity loss carryover from previous years and whether they overpaid their self-employment tax. Finally, we must decide whether the Hardys are liable for section 6662(a) accuracy-related penalties.

I.       Burden of Proof

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving otherwise.[4] In limited situations the burden may shift to the Commissioner under section 7491(a), but there is not enough information in the record to conclude that the burden should shift under section 7491(a), and the Hardys do not argue that it should. Accordingly, the burden remains on them. Taxpayers bear the burden of proving that they have met all requirements necessary to be entitled to the claimed deductions.[5]

---

[4]Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[5]Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

**[*13]** II.    <u>Whether the Hardys May Deduct Portions of Their Passive Activity Losses</u>

In most passive activity loss cases, taxpayers claim a deduction for certain business and investment expenses under sections 162 and 212. The Commissioner determines that the activity is passive under section 469 and disallows a deduction. The Hardys reported income as passive for 2008 through 2010 and absorbed a passive activity loss carryover from previous years, and the Commissioner has determined that the activity is nonpassive. Accordingly, each party is advancing a position that is more commonly argued by the other side.

Section 469 generally disallows a deduction for any passive activity loss.[6] A passive activity loss is defined as the excess of the aggregate losses from all passive activities for the taxable year over the aggregate income from all passive activities for that year.[7] In general, a passive activity is any trade or business in which the taxpayer does not materially participate.[8] A taxpayer materially participates in an activity if the taxpayer is involved in the operations of the

---

[6]Sec. 469(a).

[7]Sec. 469(d)(1).

[8]Sec. 469(c)(1).

[*14] activity on a regular, continuous, and substantial basis.[9]  When a taxpayer's passive activity loss deduction is disallowed, it is treated as a deduction for the next taxable year.[10]  Dr. Hardy's activity at MBJ does not meet the material participation test.

### A.    The Hardys Did Not Group Dr. Hardy's Activities.

Section 469 does not define "activity".  The Secretary, however, has prescribed regulations pursuant to section 469(l) which specify what constitutes an "activity".  Section 1.469-4(c), Income Tax Regs., sets forth the circumstances for grouping tax items to determine what constitutes a single activity.  That regulation provides that "[o]ne or more trade or business activities or rental activities may be treated as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of section 469."  Whether activities constitute an "appropriate economic unit" depends on the facts and circumstances.[11]  The regulation gives the greatest weight to five factors:

(i) Similarities and differences in types of trades or businesses;

(ii) The extent of common control;

---

[9]Sec. 469(h)(1).

[10]Sec. 469(b).

[11]Sec. 1.469-4(c)(2), Income Tax Regs.

**[*15]** (iii) The extent of common ownership;

(iv) Geographical location; and

(v) Interdependencies between or among the activities * * * [12]

This regulation further provides that taxpayers can "use any reasonable method of applying the relevant facts and circumstances" to group activities and that not all of the five factors are "necessary for a taxpayer to treat more than one activity as a single activity".[13] Thus, taxpayers have some flexibility in determining what constitutes an appropriate economic unit. Importantly, section 1.469-4(e), Income Tax Regs., provides that once a taxpayer has grouped activities, the taxpayer cannot regroup those activities unless "it is determined that a taxpayer's original grouping was clearly inappropriate or a material change in the facts and circumstances has occurred that makes the original grouping clearly inappropriate".[14]

The Commissioner encourages us to find that the Hardys grouped Dr. Hardy's ownership interest in MBJ with his medical practice because the Hardys

---

[12]Sec. 1.469-4(c)(2), Income Tax Regs.; see also Lamas v. Commissioner, T.C. Memo. 2015-59, at *30-*31.

[13]Sec. 1.469-4(c)(2), Income Tax Regs.

[14]Sec. 1.469-4(e), Income Tax Regs.

[*16] had previously reported the income from MBJ as nonpassive. The Hardys did not explicitly group their activities, and for the years in issue they were not required to do so.[15] But the Commissioner asks us to infer that the Hardys grouped Dr. Hardy's ownership interest in MBJ with his medical practice into a single unit to treat the income as nonpassive.

We will not infer that the Hardys grouped Dr. Hardy's ownership interest in MBJ with his medical practice as the Commissioner requests because such a grouping is not supported by the evidence. The mere fact that the Hardys reported Dr. Hardy's activity as nonpassive is not enough for us to find that they grouped Dr. Hardy's ownership interest in MBJ with his medical practice. Instead, Mr. Kero explained that he did not group the activities. He explained that he determined that the income from MBJ was nonpassive by applying his training and experience and by relying on the Schedule K-1, which reported income from a trade or business and self-employment tax. Moreover, he stated that he did not consider section 1.469-4, Income Tax Regs. We find him credible. There is no

_____

[15]Revenue Procedure 2010-13, sec. 4.02, 2010-4 I.R.B. 329, 330, requires taxpayers to file a written statement that the taxpayer is grouping two or more trade or business activities into a single activity for taxable years beginning after January 25, 2010. Although Rev. Proc. 2010-13, supra, was not in effect for the years in issue, Rev. Proc. 2010-13, section 4.06, 2010-4 I.R.B. at 330-331, applies to changes to preexisting groupings. Because we conclude that there was no preexisting grouping, this provision does not apply.

[*17] evidence that the Hardys grouped Dr. Hardy's ownership interest in MBJ with his medical practice activity for 2006 or 2007. Accordingly, the Hardys did not regroup their activities for 2008 when they began reporting the income as passive. They have consistently treated the activities as separate economic units.

    B.    <u>The Commissioner Cannot Regroup a Taxpayer's Reasonable Grouping</u>.

Section 1.469-4(f), Income Tax Regs., provides the rules for when the Commissioner can regroup a taxpayer's activities. He may do so if "any of the activities resulting from the taxpayer's grouping is not an appropriate economic unit and a principal purpose of the taxpayer's grouping (or failure to regroup under paragraph (e) of this section) is to circumvent the underlying purposes of section 469."[16] The regulation is conjunctive; each requirement must be met in order for the Court to determine that the taxpayers must regroup.[17] The regulation illustrates the Commissioner's regrouping authority in an example involving doctors who converted a portion of their practices into a passive income generating activity. The facts of the example state:

> Taxpayers D, E, F, G, and H are doctors who operate separate medical practices. D invested in a tax shelter several years ago that

---

[16]Sec. 1.469-4(f)(1), Income Tax Regs.

[17]See <u>Minahan v. Commissioner</u>, 88 T.C. 492, 497 (1987).

[*18] generates passive losses and the other doctors intend to invest in real estate that will generate passive losses. The taxpayers form a partnership to engage in the trade or business of acquiring and operating X-ray equipment. In exchange for equipment contributed to the partnership, the taxpayers receive limited partnership interests. The partnership is managed by a general partner selected by the taxpayers; the taxpayers do not materially participate in its operations. Substantially all of the partnership's services are provided to the taxpayers or their patients, roughly in proportion to the doctors' interests in the partnership. Fees for the partnership's services are set at a level equal to the amounts that would be charged if the partnership were dealing with the taxpayers at arm's length and are expected to assure the partnership a profit. The taxpayers treat the partnership's services as a separate activity from their medical practices and offset the income generated by the partnership against their passive losses.[18]

The example in the regulation concludes that the Commissioner can regroup the taxpayers' activities into a single unit. It explains further that the taxpayers' medical practice services and the services provided by the partnership are an appropriate economic unit, and the principal purpose of treating the medical practices and the services provided by the partnerships as a separate activity is to circumvent the underlying purposes of section 469.[19]

The Commissioner argues that the Hardys' facts are almost identical to the facts of the example in the regulations. He argues that, similar to the partnership

---

[18]Sec. 1.469-4(f)(2), Example, Income Tax Regs.

[19]Sec. 1.469-4(f)(2), Example, Income Tax Regs.

**[*19]** in the example in the regulation, MBJ is owned by physicians, and MBJ provides services to their patients.

The Hardys distinguish their facts from the facts of this example. They argue that Dr. Hardy's ownership interest in MBJ and his medical practice do not constitute an appropriate economic unit as a single activity because the activities are different types of businesses: MBJ is a rental surgical facility and Dr. Hardy's practice is an active medical practice. Additionally, they argue that they did not have a principal purpose of circumventing section 469 when they treated the activities as separate because Dr. Hardy did not join MBJ to artificially create a passive activity loss. They contend that he had a business purpose in joining MBJ.

After trial the IRS released a technical advice memorandum further illustrating the Commissioner's regrouping authority.[20] A technical advice memorandum is a determination based on the specific facts of a case and is not a ruling of general applicability.[21] Although we recognize that a technical advice memorandum may not be cited for its precedential value, it does reveal "'the interpretation put upon the statute by the agency charged with the responsibility of

---

[20]Tech. Adv. Mem. 201634022 (Aug. 19, 2016).

[21]See Golden Belt Tel. Ass'n, Inc. v. Commissioner, 108 T.C. 498, 506 (1977).

[*20] administering the revenue laws' and may provide 'evidence' that such construction 'is compelled by the language of the statute.'"[22]

The Hardys argue that their facts are similar to the facts in the technical advice memorandum. In the technical advice memorandum, the taxpayer is a physician. During the first year he is an employee and partial owner of a medical practice. During the remaining years in issue he is an employee and partial owner of a second medical practice. Both medical practices are S corporations. During all the years the physician had a small ownership interest in an LLC classified as a partnership, which in turn held an interest in a surgery center also classified as a partnership. An unrelated entity owns the remaining interest in the surgery center. The physician explained that the LLC was established by a group of physicians to acquire an interest in the surgery center. The surgery center provides surgery facilities for qualified licensed physicians. The physicians are not required to be owners of the practice. And they are not involved in the day-to-day management of the surgery center. The physician represented that physicians cannot refer their patients to the surgery center when they hold a financial interest. However, the patients often chose the surgery center because it was more cost efficient. The

---

[22]Woods Inv. Co. v. Commissioner, 85 T.C. 274, 281 n.15 (1989) (quoting Hanover Bank v. Commissioner, 369 U.S. 672, 686-687 (1962)).

[*21] physician also explained that the income generated by the surgery center is not tied to the number of surgeries he performs at the surgery center. And before the opening of the facility, the surgeries that could not be performed in the physician's practice were performed at a local hospital. The revenue generated by the surgery center through facility charges is separate from the charges for medical services rendered by the physician to his patients. The physician had passive activity losses and suspended losses. The physician treated the income from the LLC as passive and deducted the entire passive activity loss.[23]

In the technical advice memorandum, the IRS explained that these facts are distinguishable from those of the example provided in section 1.469-4(f)(2), Income Tax Regs. In looking at the facts and circumstances provided in section 1.469-4(c), Example, Income Tax Regs., the IRS explained in the technical advice memorandum that there is more than one way to group the activities into appropriate economic units. The IRS looked at the fact that the physician and the surgery center provide different types of medical services. The physician has different ownership interests and control. And, the services patients receive at the surgery center do not constitute all of the services performed at the surgery center.

---

[23]Tech. Adv. Mem. 201634022.

**[\*22]** Thus, the IRS explained that there may be more than one reasonable method of grouping the taxpayer's activities into an appropriate economic unit.[24]

Likewise, the IRS determined that the facts do not support a finding that the physician acquired his interest with a principal purpose of circumventing the underlying purposes of section 469. The IRS explained that unlike the doctor in the example in the regulation, the physician in the technical advice memorandum did not convert a portion of his practice into a single passive income generator by contributing equipment to a separate entity and leasing back the equipment at arm's-length rates. Thus, the IRS concluded that the Commissioner does not have the authority to regroup the physician's interest into a single activity.[25]

The Commissioner argues that the facts in this case are distinguishable from the facts in the technical advice memorandum. The Commissioner's principal argument is that the Hardys originally grouped Dr. Hardy's medical practice with MBJ. However, as previously addressed, when the Hardys reported their MBJ income as nonpassive for 2006 and 2007, they did not group Dr. Hardy's ownership interest in MBJ and his medical practice into a single economic unit.

[24]Tech. Adv. Mem. 201634022.

[25]Tech. Adv. Mem. 201634022.

[*23] The Commissioner maintains that the facts are more closely aligned with those of the example in the regulation.  We disagree.

There is more than one reasonable method of grouping Dr. Hardy's activities.  Section 1.469-4(c)(1), Income Tax Regs., provides a list of facts and circumstances that are given the greatest weight in determining whether the activities are an appropriate economic unit.  The facts in this case lend support to more than one reasonable method of grouping Dr. Hardy's ownership interest in MBJ and his medical practice.

While some facts support treating Dr. Hardy's ownership interest in MBJ and his medical practice as a single economic unit, the weight of the evidence supports treating them as separate economic units.  Dr. Hardy is the sole owner of his medical practice and only a minority owner of MBJ.  Although he actively manages his medical practice, Dr. Hardy does not have any management responsibilities in MBJ.  His medical practice and MBJ do not share any building space, employees, billing functions, or accounting services.  Dr. Hardy performs services different from MBJ's:  Dr. Hardy is a surgeon providing care, and MBJ is a surgical center providing space and associated services.  Dr. Hardy is limited in the care he can provide at his office.  His office is equipped for procedures requiring local anesthesia whereas MBJ is equipped for procedures requiring local

[*24] or general anesthesia.  When patients decide to have procedures performed at MBJ, they separately pay a surgical fee to Dr. Hardy and a facility fee to MBJ. MBJ then distributes earnings from those facility fees, but the distribution is unrelated to whether Dr. Hardy performs surgeries at MBJ.  In contrast, Dr. Hardy will receive income from his medical practice only if he performs procedures. Thus, the income Dr. Hardy receives from MBJ is not linked to his medical practice.  Accordingly, Dr. Hardy's ownership interest in MBJ and his medical practice may be treated as separate economic units.[26]

Additionally, the Hardys did not have a principal purpose of circumventing the underlying purposes of section 469 when they treated the activities as separate. Unlike the taxpayers in the example in section 1.469-4(f)(2), Income Tax Regs., Dr. Hardy did not form an entity to generate passive activity losses.  MBJ was already established when Dr. Hardy became a member.  Moreover, Dr. Hardy has never been able to perform procedures requiring general anesthesia at Northwest Plastic Surgery.  Thus, he did not take a portion of his medical practice and convert it into a passive activity.  Additionally, the Hardys considered opening

---

[26]Because the Hardys may group Dr. Hardy's activities in more than one way, the Hardys' grouping was not a "clearly inappropriate" one which would require them to regroup their activities under section 1.469-4(e) and (f)(1), Income Tax Regs.

[*25] their own surgical facility before Dr. Hardy became a member of MBJ. It is clear that his purpose in joining MBJ was to create a cost-efficient alternative to a hospital procedure and not to generate passive activity losses. Accordingly, the Hardys' principal purpose was not to avoid the underlying purposes of section 469.

The Commissioner may not regroup Dr. Hardy's activities for the years in issue. The Commissioner may not regroup a taxpayer's grouping if that grouping is reasonable.[27] The facts of this case are very similar to those presented in Tech. Adv. Mem. 201634022, in which the IRS allowed a medical practice and a surgical center to be treated as separate activities. Although the technical advice memorandum is not precedential,[28] it shows that the Hardys' grouping was not clearly inappropriate.[29] Further, they did not have a principal purpose of circumventing the underlying policies of section 469.

---

[27]Sec. 1.469-4(c)(2), (f)(1), Income Tax Regs.

[28]Sec. 6110(k)(3).

[29]See sec. 1.469-4(e)(2), Income Tax Regs.

[*26] C.    <u>The Hardys May Not Deduct a Passive Activity Loss Carryover From Prior Years</u>.

In finding that the Hardys may report Dr. Hardy's income from MBJ as passive for the years in issue, we are left to determine the proper amount of the passive activity loss carryover from prior years. Section 6214(b) provides that in redetermining a deficiency in income tax for any taxable year, we must consider facts relating to the tax for other years as may be necessary correctly to redetermine the amount of the deficiency for the year before us. Because the Hardys claim that they had a passive activity loss that carried over to 2008 (a year before us), we must look to the prior years to compute the proper amount of that passive activity loss carryover. After all, a taxpayer is entitled to a passive activity loss carryover only when there is an excess of passive losses over passive income.[30] And "we find no impediment to our use of facts in a later year as part of the process of recomputing a tax liability for an earlier barred year in order to arrive at the correct tax liability for an open year in issue".[31]

We have concluded that the Hardys did not group Dr. Hardy's ownership interest in MBJ with his medical practice for 2006 or 2007. And we have

---

[30]Sec. 469(b).

[31]<u>Lone Manor Farms, Inc. v. Commissioner</u>, 61 T.C. 436, 441 (1974), <u>aff'd without published opinion</u>, 510 F.2d 970 (3d Cir. 1975).

[*27] concluded that Dr. Hardy may treat his ownership interest in MBJ as passive. That leads us to the inescapable conclusion that the Hardys erroneously treated Dr. Hardy's income from MBJ as nonpassive for 2006 and 2007. The Hardys reported a total unallowed loss of $58,786 for 2006. For 2007 they reported unallowed losses of $119,615, which included the $58,786 carryover from 2006. The Hardys reported Dr. Hardy's distributions from MBJ of $279,988 and $199,121 as nonpassive for 2006 and 2007, respectively. Had the Hardys properly reported the MBJ income as passive for 2006 and 2007, it would have fully absorbed their passive losses and there would have been no passive loss to carry forward to 2008. Accordingly, they are not entitled to the full passive activity loss deduction claimed.

The Hardys argue for the first time in their opening brief that the doctrine of equitable recoupment applies. Equitable recoupment is an affirmative defense.[32] Section 6214(b) grants the Court jurisdiction to consider claims of equitable recoupment; however, the party raising an affirmative defense will waive the defense if they do not specifically plead it.[33] We have entertained an argument for

---

[32]Menard, Inc. v. Commissioner, 130 T.C. 54, 62-63 (2008); Wolfington v. Commissioner, T.C. Memo. 2014-45, at *12.

[33]See Rule 39; Wolfington v. Commissioner, at *12.

**[\*28]** equitable recoupment when the Commissioner had notice of the argument before trial,[34] but here, the Commissioner had no such notice.

The Hardys did not plead equitable recoupment in their petition, and they have not moved to amend their petition. They have waived this defense.

III. Whether the Hardys Are Liable for Self-Employment Tax on Dr. Hardy's Distributive Shares of Income From MBJ

A. Motion To Conform the Pleadings

In appropriate circumstances, we may treat an issue that was not expressly pleaded but was tried by express or implied consent of the parties as if raised in the pleadings.[35] However, whether a motion to conform the pleadings should be allowed is within the discretion of the Court.[36] If the opposing party is prejudiced or unfairly surprised, then the motion should be denied.[37]

---

[34]See, e.g., Whalen v. Commissioner, T.C. Memo. 2009-37 (explaining that the Court entertained an argument of equitable recoupment because the Commissioner was put on notice when the issue was raised in the pretrial memorandum).

[35]Rule 41(b)(1); LeFever v. Commissioner, 103 T.C. 525, 538-539 (1994), aff'd, 100 F.3d 778 (10th Cir. 1996).

[36]Commissioner v. Estate of Long, 304 F.2d 136, 144 (9th Cir. 1962); Estate of Quick v. Commissioner, 110 T.C. 172, 178-180 (1998).

[37]See, e.g., Estate of Quick v. Commissioner, 110 T.C. at 178-180; Phillips v. Commissioner, T.C. Memo. 2013-215, at \*9.

[*29]  After a review of the entire record, we find that the factual issues giving rise to the Hardys' motion were raised during trial with the Commissioner's consent. The evidence on which the Hardys base their motion was admitted at trial in the parties' stipulation of facts.  The Commissioner addressed the liability for self-employment tax in his opening brief.  Accordingly, we will grant the Hardys' motion to conform the pleadings to the evidence that they are not liable for self-employment tax for 2008 or 2009.

B.    Limited Partners Acting as Investors

Section 1401(a) and (b) imposes a tax on self-employment income.  "Self-employment income" generally means net earnings from self-employment,[38] which in turn means gross income less allowable deductions from a taxpayer's trade or business plus the "distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member".[39]  Section 702(a)(8) provides that in determining income tax, each partner must take into account separately his distributive share of the partnership's taxable income or loss.  Therefore, a partner

---

[38]Sec. 1402(b).

[39]Sec. 1402(a).

**[*30]** must generally include his distributive share of partnership income in calculating his net earnings from self-employment.

Section 1402(a) provides several exclusions from the general rule. In particular, section 1402(a)(13) excludes "the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services". The Commissioner argues that the section 1402(a)(13) exclusion does not apply in this case. He argues that because Dr. Hardy performs surgeries at MBJ, he is not acting as a limited partner. We disagree.

The Code does not define "limited partner" for purposes of section 1402(a)(13). However, we discussed the definition of limited partner in Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. 137 (2011). In that case, the partners were lawyers operating out of a law firm, which was formed as a limited liability partnership.[40] The law firm received revenue from the partners' legal fees, but the firm did not report those revenues on the firm's tax

---

[40]Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. 137, 138-139 (2011).

[*31] return as net earnings from self-employment.[41] The Commissioner determined that the partners' distributive shares of the law firm's net business income were subject to self-employment tax.[42] We agreed.[43] Because section 1402(a)(13) was enacted before limited liability entities were contemplated and the term "limited partner" remained undefined, we interpreted the statute by looking at legislative history and explained that

> [t]he intent of section 1402(a)(13) was to ensure that individuals who merely invested in a partnership and who were not actively participating in the partnership's business operations (which was the archetype of limited partners at the time) would not receive credits toward Social Security coverage. The legislative history of section 1402(a)(13) does not support a holding that Congress contemplated excluding partners who performed services for a partnership in their capacity as partners (i.e., acting in the manner of self-employed persons), from liability for self-employment taxes.[44]

We held that because the revenue was derived from legal services performed by the partners in their capacity as partners, they were not acting as investors in the law firm. Thus, we held that they were liable for self-employment tax.

---

[41]Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. at 140.

[42]Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. at 141.

[43]Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. at 146.

[44]Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. at 148-150.

**[*32]** Dr. Hardy is an investor in MBJ, which is distinguishable from the limited liability partnership formed by the partners in the law firm in <u>Renkemeyer, Campbell & Weaver, LLP v. Commissioner</u>. MBJ owns and operates a surgical center. MBJ is equipped for doctors to perform surgeries that require local and general anesthesia. MBJ bills patients for the use of the facility. Although Dr. Hardy performs surgeries at MBJ, he is not involved in the operations of MBJ as a business. In contrast to the partners in <u>Renkemeyer, Campbell & Weaver, LLP</u>, who are lawyers practicing law and receiving distributive shares based on those fees from practicing law,[45] Dr. Hardy is receiving a distribution based on the fees that patients pay to use the facility. The patients separately pay Dr. Hardy his fees as a surgeon, and they separately pay the surgical center for use of the facility in the same manner as with a hospital. Accordingly, Dr. Hardy's distributive shares are not subject to self-employment tax because he received the income in his capacity as an investor.

IV.    <u>Section 6662</u>

Section 6662(a) and (b) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax that is due to, among other things, any

---

[45]<u>Renkemeyer, Campbell & Weaver, LLP v. Commissioner</u>, 136 T.C. at 138-139.

**[\*33]** negligence or disregard of rules or regulations or a substantial understatement of income tax.  The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.[46]  Negligence has been further defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."[47]  Additionally, a taxpayer is negligent if he fails to maintain sufficient records to substantiate the items in question.[48]  An understatement of income tax is "substantial" when that understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.[49]

The Commissioner bears the burden of production for this penalty before the burden shifts to taxpayers to prove that the penalty should not apply.[50]  The Commissioner has not proven that the Hardys acted negligently.  The

---

[46]Sec. 6662(c).

[47]Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g in part, remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299).

[48]See Higbee v. Commissioner, 116 T.C. 438, 449 (2001); sec. 1.6662-3(b)(1), Income Tax Regs.

[49]Sec. 6662(d)(1)(A).

[50]See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447.

[*34] Commissioner did not provide any evidence that any portion of the underpayment of tax was due to the Hardys' failure to make a reasonable attempt to comply with the Code, lack of due care or failure to do what a reasonable and ordinarily prudent person would do, or failure to maintain sufficient records. Accordingly, the Commissioner has not met his burden regarding negligence.

However, in accordance with this opinion, the Hardys' exact underpayment for each year depends on the Rule 155 computations. If these computations establish a substantial understatement of income tax for any year, the Commissioner will have met his burden of production with respect to that year.[51]

If the Rule 155 computations establish a substantial understatement of income tax for any year, the accuracy-related penalty will not apply to any portion of the underpayment where the taxpayers establish that they had reasonable cause and acted in good faith.[52] Taxpayers may establish that they had reasonable cause and acted in good faith through reliance on the advice of a tax professional.[53] The reliance must have been reasonable and in good faith under all the

---

[51]See Olagunju v. Commissioner, T.C. Memo. 2012-119; Jarman v. Commissioner, T.C. Memo. 2010-285.

[52]Sec. 6664(c)(1).

[53]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(c), Income Tax Regs.

[*35] circumstances.[54]  To demonstrate that the reliance was reasonable and in good faith, the taxpayer must prove by a preponderance of the evidence that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."[55]

Taking into consideration all the facts and circumstances, we find that the Hardys reasonably relied on Mr. Kero in good faith regarding the portion of the underpayment for 2008 that is attributable to the passive activity loss carryover. Mr. Kero has 40 years of experience.  He prepared the returns for 2006 through 2010.  He reported the income from MBJ as nonpassive for 2006 and 2007 and passive for 2008 through 2010, and the Hardys provided him with corroborating information.  Although he understood that characterizing income as passive or nonpassive can have a profound effect on a taxpayer's income, he did not take into account the proper characterization of Dr. Hardy's income from MBJ when considering the amount of the passive activity loss carryover.  The Hardys relied

---

[54]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99; sec. 1.6664-4(b)(1), (c), Income Tax Regs.

[55]Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

[*36] on his advice and experience in preparing their returns. Accordingly, the Hardys had reasonable cause and acted in good faith through reliance on the advice of a tax professional.

The Hardys did not provide any evidence regarding the portion of the underpayment for each year that is attributable to the disallowed charitable contribution deduction. Accordingly, they have not established that they had reasonable cause and acted in good faith with respect to the portion of the underpayment for each year arising from that item.

V.    Conclusion

The Hardys may treat their income from MBJ as passive. However, they have not established that they may deduct the passive activity loss carryover from years in which they treated the income as nonpassive. For 2008 and 2009 the Hardys overpaid their self-employment tax because Dr. Hardy's distributive share from MBJ is excluded from net earnings from self-employment. The Commissioner did not meet his burden of production regarding the section 6662(a) accuracy-related penalties for negligence; however, he may have met his burden of production for underpayments attributable to substantial understatements of income tax if the Rule 155 computations establish substantial understatements of income tax. If that threshold is met for any year, no penalty applies to the portion

**[\*37]** of the underpayment for that year attributable to the passive activity loss carryover because the Hardys established that they had reasonable cause and acted in good faith through reliance on the advice of a tax professional.  Because the Hardys did not provide any defense for any of the years in issue for the portion of the underpayment that is attributable to the charitable contribution deduction, they have not established any defense to a penalty attributable to that portion of the resulting underpayment.

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.